# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ALISHA STRIFE, Plaintiff, | ) | |
| | ) | NO. 4:23-cv-358 |
| VS. | ) | |
| | ) | JURY DEMANDED |
| ALDINE INDEPENDENT SCHOOL DISTRICT, Defendant. | ) | |

*******************************************************

REMOTE ORAL DEPOSITION OF
DR. JAVIER VILLARREAL
JANUARY 12, 2024

*******************************************************

REMOTE ORAL DEPOSITION OF DR. JAVIER VILLARREAL, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above styled and numbered cause on Friday, January 12, 2024, from 1:04 p.m. to 4:15 p.m., before ROBIN GROSS, CSR in and for the State of Texas, reported by shorthand machine, with the witness at the Offices of 9999 Veterans Memorial Parkway, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record herein.

A P P E A R A N C E S

FOR THE PLAINTIFF:

MR. SCOTT NEWAR
Newar Law Firm
440 Louisiana, Suite 900
Houston, Texas 77002
713-226-7950
Newar@newarlaw.com

FOR THE DEFENDANT:

MR. CORY RUSH
MR. ANDREW FRANCIS
Spalding Nichols Lamp Langlois
3700 Buffalo Speedway, Suite 500
Houston, Texas 77098
(713) 993-7060
Crush@snll-law.com
Afrancis@snll-law.com

ALSO PRESENT:

MS. ALISHA STRIFE

MS. CANDICE O'BRIEN, Newar Law Firm

# I N D E X

PAGE

Appearances .................................. 2

DR. JAVIER VILLARREAL
Examination by Mr. Newar.................. 4

Signature and Changes......................... 95

Reporter's Certificate........................ 97

## E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| | (None marked.) | |

P R O C E E D I N G S (1:04 p.m.)

DR. JAVIER VILLARREAL,

having been duly sworn, testified as follows:

EXAMINATION

BY MR. NEWAR:

Q. Dr. Villarreal, good afternoon.

**A. Good afternoon.**

Q. Can you hear me all right?

**A. Yes, sir.**

Q. All right. I'm having a little trouble hearing you. Your voice may be a little bit low or -- but the court reporter is going to be transcribing our deposition. So if you could speak up as loudly as normally possible, that would help us.

**A. Yeah.**

Q. I am -- I am Scott Newar. I'm the attorney for Alisha Strife in this lawsuit that has been filed against Aldine Independent School District. I'll refer to Aldine Independent School District as AISD throughout your deposition. Is that understood?

**A. Yes, sir.**

Q. Okay. And to go over just a couple of ground rules before we get started, first of all, have you ever been deposed?

**A. No.**

Q. Okay. All right. So this is your maiden voyage. Just to make sure you understand -- I know you've got two lawyers with you here today, or maybe three; I guess Ms. DeWalt is not on, but Mr. Rush is and Mr. Francis. So you understand, presumably, from talking with them what a deposition is; is that -- is that accurate?

**A. That is correct.**

Q. Okay. So I'm going to be asking you questions. If you would allow me to finish asking the question -- since we're on Zoom, there's a little bit longer delay than if we were face to face. But just give me -- hold your breath for a count of 2 or 3 before you start to answer, because the court reporter is taking down my questions and your answers and she needs to be able to get clear and accurate transcript.

You took an oath at the start of the deposition. That oath requires you to tell the full and complete truth. If the witness in a deposition fails to testify truthfully under oath, it's just like it would be in a courtroom in front of a judge; there can be penalties of perjury. Do you understand that as well?

**A. Yes.**

Q. All right. Is there any reason, sort of a physical illness of some kind or other circumstances, that would prevent you from testifying fully and

accurately today?

**A. No, sir.**

Q. Okay. You're in good health today? You look well, but are you in good health?

**A. Yes.**

Q. Okay. Before the deposition started here this afternoon, did you have -- you said you had an opportunity to visit with Mr. Francis and Mr. Rush. When did you last visit with them about your deposition?

**A. Oh, goodness, was it two days? Two days ago? Yes. Two days, two days ago.**

Q. And where was that visit?

**A. Via Zoom.**

Q. And approximately how long did that last?

THE REPORTER: Hang on just a second. Scott, you're freezing.

MR. NEWAR: Yeah, I'm concerned again, Robin -- let's go off the record.

(Recess from 1:08 p.m. to 1:14 p.m.)

Q. (BY MR. NEWAR) All right. Dr. Villarreal, can you hear me okay, now?

**A. Yes, sir.**

Q. All right. I'm still having trouble hearing you a little bit, so maybe turn the octaves up a little bit.

**A. Okay.**

Q. In the -- in your meetings with -- did you have more than one meeting with Mr. Francis and Mr. Rush to prepare for the deposition?

**A. No, just one meeting. And I believe I told you two days ago. I got my days confused. It was actually on Tuesday, so three days ago. I just want to make sure that that's correct.**

Q. Okay. How long did you meet with them?

**A. For about an hour.**

Q. Was anyone else present?

**A. Yes, Kaye DeWalt, our general counsel for Aldine ISD.**

Q. Anyone else?

**A. No, sir.**

Q. Okay. Did you review any documents to prepare for your deposition here today?

**A. Yes, I did.**

Q. What documents did you review?

**A. I reviewed a timeline that Mindy Smith, the executive director of total rewards, had created last year. And then I also had a packet with -- it was a response letter that you wrote to our general counsel, Kaye DeWalt. I believe it was dated December the 6th, and it had some exhibits. And so I reviewed those two documents.**

Q. This timeline that you reviewed of -- that Mindy Smith prepared, when is the first time you saw that timeline?

**A. Last school year, it was during this whole process when she was creating the timeline.**

Q. And why did you see it at the time she was creating it?

**A. I want to believe I looked -- I saw it -- I saw it probably around the holidays. So it would be about, what, December of 2022; and as part of -- we would meet like every other week, with me as her supervisor, and we'd go over some pending items, if you will. And one of the items that was pending on her list, to-do list, was Ms. Strife's situation because, you know, we hadn't come to a decision or a conclusion with the accommodations committee and I know that she was working on it.**

**And so I had asked her, I said, "Well, can you get a" -- seemed like there were so many roadblocks, in my opinion, you know, or things not happening. So I asked her to put a timeline together just so that I could be made aware of, like, why is this taking so long.**

Q. Do you have a better fix on the date around the holidays that you had this meeting with Ms. Smith and

went over and told her to create this timeline?

**A. Oh, what I recall, I mean, it would have to have been before we went for the holidays. So I would say anywhere between December 10th through December 20th of 2022.**

Q. And then after your meeting, at some point after that meeting in -- right before the holidays with Ms. Smith, did she send you the timeline?

**A. No. She showed me a hard copy. I don't think she sent it. I remember sitting at my desk and her reviewing the timeline with me.**

Q. And when -- so before the holidays, you had this meeting where you instruct Ms. Smith to create the timeline; is that correct?

**A. Yes.**

Q. And then when do you have that followup meeting with her where you actually see a hard copy on your desk of the timeline?

**A. All of that happened within December of 2022.**

Q. Before the holidays?

**A. Yes.**

Q. When you saw the actual hard copy of the -- of Ms. Smith's timeline in this second meeting, what -- did you make any notes on it, or did you make any notes as you were reviewing it?

**A. No, I didn't make any notes on it. We just reviewed the timeline. She explained to me from the beginning until where we were at at that point.**

Q. And in that second meeting before the holidays with Ms. Smith, did you express any views as to your assessment or perspective on the situation involving Ms. Strife's request for the service dog?

**A. No, I just was hoping -- because by that time we had already made the decision to ask Ms. Strife to be examined by -- is it through Concentra, I believe, is the, you know, the physician through the district. And so the comment I made to Mindy Smith at the time was hopefully we can get this so we can go ahead and go to the accommodations committee so a decision can be made because, you know, there was -- we just didn't have the information that the accommodations committee was asking for to move forward. And it just, in my opinion, seemed like why is this not happening; why is this taking too long.**

Q. You just testified that "we" had made the decision to have Ms. Strife examined by a Concentra doctor; did I state that correctly?

**A. Yes, sir.**

Q. Who was the "we" that you're referring to?

**A. So Mindy Smith and myself.**

Q. When did you and Ms. Smith make the decision to have Ms. Strife examined by a Concentra doctor?

**A. That happened in November of 2022.**

Q. And do you have a more specific date in November, would that be somewhere in any note or calendar or other document?

**A. No. I looked as I was preparing, because I knew this was happening, you know, the only documents that I reviewed and that I could find was what I shared with you, those two documents. And so I don't have the specifics; but I do recall that all of this happened before we went on our Thanksgiving break. Because I remember specifically when we met and after she walked out of my office, I remember taking out my Christmas tree to set on my desk, because when we returned back from the Thanksgiving break it was going to be Christmas. And so that was very clear in my head as I thought through the whole process.**

Q. So sometime before the Thanksgiving holiday, you and Mindy Smith made the decision to have Ms. Strife examined by a Concentra doctor; is that accurate?

**A. Yes.**

Q. And was that a decision that was made in your office that day when you took out the Christmas -- or were beginning to prepare for, you know, moving out the

whatever was on your desk to be able to put on your Christmas tree, was that where the decision was made -- or when the decision was made?

**A. We had a discussion because, again, you know, one of my jobs as her supervisor is like where are we with pending items. And Alisha Strife's case was a pending item. And because we weren't -- we didn't have any access to any reasons as to why Ms. Strife needed a service dog or, you know, what physical limitations she had at the time, these were things that, you know, that we were seeking to have.**

**And so brainstorming, like, okay, why aren't we getting this information? While we were brainstorming, the conversation led to, well, you know, we could ask for what we call a fit for duty and maybe we could get the information that way. And so that's why we decided to go in that direction.**

Q. And you said you -- just want to pin this down -- you and Ms. Smith made that decision in your office on that day in November before the Thanksgiving holiday; is that accurate?

**A. So we discussed it and then I went and spoke with our general counsel to see if I was -- if it was appropriate for us to do that, just to make sure. And then we looked at board policy, and it did align with**

**board policy. And so -- um, I can't say if it was immediately that day or if it was when we got back from the holidays that a final decision was made.**

Q. Now, you testified that in your meeting -- or in your preparation for this deposition here today, you reviewed a letter that you said was dated -- a letter from me that you said was dated December the 6th of 2022. Is that -- is that correct?

**A. Yes, sir.**

Q. Did you actually have that letter of December the 6th, 2022, at the time it was transmitted by me to the school district?

**A. Yeah, what I had, it was on letterhead, yes.**

Q. So you actually saw a physical copy of this letter that you said was dated December the 6th of 2022, on or about December the 6th of 2022; is that accurate?

**A. Yes, sir.**

Q. Are you aware that before December the 6th or so, I'll represent to you the date of the letter in question -- or at least an email -- I'm sorry. There is a letter that is dated December the 5th of 2022 from Ms. DeWalt to me; but, anyway, we'll -- we'll leave the record for what it is.

But let me ask you this question: Were you aware of other letters that I had been sending to Ms. DeWalt,

both before and after December the 6th of 2022?

**A. I had not seen them. I -- so, no, no, I was not aware.**

Q. All right. Well, we'll go through perhaps some of these other -- some of these documents in the course of your deposition.

I take it from your testimony that you yourself never had a file or created a file on Ms. Strife's application for a service dog; is that accurate?

**A. The only file -- the only thing I had in a file -- I created a file, but was the timeline, you know, a hard copy of that timeline that I shared with you and that December 6th letter which was your response to our general counsel's December 5th letter. That's the only thing I had in the file.**

Q. And does that file -- is that file still in your office?

**A. No.**

Q. Did -- I'm sorry, go ahead.

**A. It was actually -- it stayed in the human resources office because I was chief of HR at that time. July 1st, 2023, I transitioned to be chief of schools and I moved buildings and offices. So I had to go to the H -- to my former office and ask the new chief human resource officer if I could look in there because I**

**needed to prepare for this. And that was the file that I found. And so I put it in my backpack and took it home.**

Q. Were there any notes that were made on the outside or inside of the file itself, other than the fact that you had documents inside?

**A. No. It was just the copy of the -- of those two documents.**

Q. Did you ever create any internal memoranda or account from your perspective of what was happening with Ms. Strife's request for a service dog?

**A. No.**

Q. Was Ms. Smith, as far as you were concerned, AISD's point person on this issue of Ms. Strife's request for a service dog?

**A. Yes.**

MR. NEWAR: Candice, if you would, pull up for Dr. Villarreal the first seven pages of the document that Mr. Rush sent us this morning.

Candice, are you there? I guess she dropped off. Let's give her a second to come back on.

(Pause.)

MR. NEWAR: Robin, let's go off for a second while she gets back on.

(Recess from 1:31 p.m. to 1:33 p.m.)

Q. (BY MR. NEWAR) There's a document in front of you now, Mr. -- Dr. Villarreal. Apologies.

MR. NEWAR: Candice, can you make the Bates stamp number larger at the bottom? All right.

Q. (BY MR. NEWAR) It's AISD -- I can't see the number, hold on -- AISD 654. Do you see that number, Dr. Villarreal?

**A. Yes, sir.**

Q. Okay. Now, Mr. Rush sent this over this morning. Is AISD 654 your calendar in September of 2022?

**A. I've never seen my calendar look like this. So, I mean, I'm looking, what I'm looking at looks familiar.**

Q. Okay.

**A. I've never -- like I said, I've never seen it laid out like this before.**

Q. Okay.

MR. NEWAR: Let's go down to the September -- November 2022, Candice, it should be two or three -- yeah, that one right there.

Q. (BY MR. NEWAR) All right. Here's AISD 656, I believe. And I'll represent to you that Mr. Rush has represented to us that this is your calendar, or at least a portion of your calendar, in November of 2022.

MR. NEWAR: Candice, can you make it bigger, the print bigger for us?

Q. (BY MR. NEWAR) All right. So on this calendar, Dr. Villarreal, there is a reference to -- on November the 16th, to a 3:00 o'clock meeting regarding Alisha Ann Strife.

**A. I see that.**

Q. Do you recall what that meeting -- obviously it appears to have been about Alisha Strife. Is that accurate?

**A. It appears to be, yes.**

Q. Do you recall what that meeting was about?

**A. No.**

Q. Is that the meeting perhaps before the holiday, the Thanksgiving holiday, where you met with Ms. Smith and decided to have Ms. Strife undergo a medical exam?

**A. It could be because it's in line with my memory and thought of the timeline, because, you know, I told you it was right before the -- we left for the holidays. So I would assume that's what it is.**

Q. Do you recall any other specific calendar entries, or meetings, regardless of whether they were calendared, that you had about Ms. Strife during the period of September 2022 through February the 24th of 2023?

**A. The only thing that I recall that was official meetings were our accommodations committee; however, it**

wasn't just myself and Mindy Smith, it was the others on the accommodations committee.

But the way accommodations committee works is the information is presented, but nobody knows who -- the actual employee's name. We keep that confidential. And so those would be the only official meetings.

Now, in my check-ins, whenever we had an opportunity, because things were crazy, they weren't -- my check-ins with my direct reports is when I had time. Like I said, on a pending list, you know, what's going on with this and this and that. Ms. Strife was on part of the conversation for several months because of the situation. And so we would touch base about where are we at, what -- have we heard anything, anything new, anything I need to be aware of, things like that.

Q. Did you ever have any direct meetings or conversations with Ms. Strife in the period September 1 of 2022 through February the 4th of 2023 to discuss her application for a service dog?

A. Did I meet with Ms. Strife? I don't recall that I met with her specifically about her application for a service dog. There was one meeting -- and I want to say it was the beginning of -- or it was sometime in September that we did meet with her regarding a situation that she experienced with Broadspire and a

**representative that she reported was disrespectful to her and cursed at her. And so we wanted to follow up with her and so I asked Mindy Smith to pull the audio recordings, and once we pulled those, we met with -- with Alisha to discuss it.**

Q. In that meeting did Ms. Strife express to you an unhappiness or dissatisfaction with the way that Broadspire was handling her application for a service dog?

**A. Yes.**

Q. All right. We'll be jumping around a little bit throughout the day, so I want to move on to a couple of other areas at the moment.

A little personal history on you, Dr. Villarreal. What is your date of birth?

**A. My date of birth is April 3rd, 1975.**

Q. And have you ever been charged with any criminal offense, other than a traffic ticket?

**A. No.**

Q. Education, you have a doctorate, I gather, and what is your doctorate in?

**A. I have a doctorate in educational leadership.**

Q. And when did you obtain that doctorate?

**A. In May of 2012.**

Q. May of what year?

**A. 2012.**

Q. And what University?

**A. University of Houston.**

Q. Do you have any other advanced degrees?

**A. I have a master's degree from the University of St. Thomas; and that was obtained in 2002, I believe.**

Q. What's that master's in?

**A. Master's in education, specifically in school counseling.**

Q. Do you hold any other advanced degrees?

**A. No.**

Q. So you have an undergraduate degree, and what is that in?

**A. Bachelor's of arts in psychology from the University of Houston, obtained in December 1997.**

Q. Any other undergraduate degrees?

**A. No.**

Q. Your LinkedIn page contains a number of prior employment, or some prior employment at least, before you worked at Aldine. Is the LinkedIn page accurate as to dates and places of employment before AISD?

**A. Yes, sir, it should be.**

Q. So you were assistant superintendent at Fort Bend ISD; is that correct?

**A. Yes, sir.**

Q. That would have been from October 2012 until November of 2018?

**A. Yes, sir.**

Q. And then you were an adjunct professor at the University of Houston, January of 2018 to present; is that correct?

**A. Yes, I would say present; but I haven't done adjunct in a couple of semesters there. So, I mean if they asked me, I would; but I just haven't done it the past couple of semesters.**

MR. NEWAR: Candice, you can take off the calendar for now, just get Dr. Villarreal back.

Q. (BY MR. NEWAR) And then according to LinkedIn you were the chief -- you've been the chief human resources officer from -- at Aldine from November 2018 to present, but that's not exactly accurate, correct?

**A. That is correct; but I believe my LinkedIn was updated this summer. I'm not sure when that was pulled, the information you have, but it should indicate I'm chief of schools as of July 1st.**

Q. Chief of schools, what day again?

**A. July 1st, 2023, to present.**

Q. According to LinkedIn, you were the chief CHRO, the chief human resources officer, from November 2018. When did that -- would that have stopped on July the 1st

of 2023?

**A. Correct.**

Q. Okay. While you were the chief human resources officer at AISD, who did you report to directly?

**A. Dr. LaTonya M. Goffney, superintendent of schools.**

Q. Did you ever discuss with Dr. Goffney Ms. Strife's application for a service dog?

**A. I believe once or twice we -- well, initially we let her know that we had an employee that we were still making a decision on. And then probably months later, you know, we'd inform her the decision still hasn't been made. And then when a decision was made, we let her know.**

Q. Okay. When you say that "we" informed Dr. Goffney that there was an employee who had requested a service dog, who were the -- who's the "we" we're referring to?

**A. Our general counsel, Kaye DeWalt, and myself.**

Q. And when you say that "we" months later reported that the decision still had not been made, who's the "we" you are referring to?

**A. So I guess I need to correct that. "I," on my -- I would have one-on-one meetings with her like every three weeks. And that was, again, on my agenda. And**

**she would ask how are things going, and it would be one of those, like, "Oh, well, this is still pending." And it was as simple as that.**

Q. Did you inform Dr. Goffney that it was Ms. Strife who had requested the service dog at any of those meetings?

**A. No. I just informed her we had an employee. Just like we do with all of our employees who request an accommodation, we keep their name private or confidential.**

Q. Did Dr. Goffney request any documentation from you on the service dog -- Ms. Strife's service dog application at any of those three meetings?

**A. No. No, she doesn't get into the weeds that way, no.**

Q. And did you ever send any written report -- do you make written reports, by the way, to Dr. Goffney?

**A. Not directly to Dr. Goffney. Anything in writing is when we have to do board reports at our monthly board meetings to the board of trustees. That would be the only thing that would be in writing.**

Q. Do you have any legal training, Dr. Villarreal?

**A. No.**

Q. Do you have any medical training of any kind?

**A. No.**

Q. What is your AISD email address?
**A. Jovillarreal@aldineisd.org.**
Q. I understand you are a dog owner yourself; is that correct?
**A. Yes, sir.**
Q. How many dogs do you own?
**A. Two.**
Q. What kind of dogs do you have?
**A. Cavapoos.**
Q. Have you ever worked with any service animal of any kind?
**A. Me work with a service animal, no.**
Q. Have you ever fostered a service animal?
**A. No.**
Q. Have you ever been involved either as a member or supporter of any organization that trains or provides service animals?
**A. No.**
Q. During your employment at AISD, have you ever attended any presentation that provided education or information about service animals?
**A. No.**
Q. Were you involved in any way in the decision to terminate Broadspire as the third-party provider for AISD employees with respect to their applications for

accommodations?

A. Yes, I was.

Q. What was your involvement in that decision to terminate Broadspire?

A. Well, as the chief of HR, having to field all the complaints, because when we transitioned from one management system over to Broadspire we were promised certain things that they were to do for us, and they weren't following through. And this is -- this -- or Ms. Strife's case is a perfect example where, you know, they told us that we had all the bells and whistles, specifically that they would lead in the interactive process, which we thought they were, but they weren't.

We got complaints that they just weren't customer friendly, they were giving wrong information out, they were closing cases without -- that shouldn't have been closed, that should have stayed open, and not communicating with us. And so there was a long laundry list of just, concerns.

And so it triggered us to look at the vendor, look at the company closely, you know, is this really meeting our needs, we're paying for a service and we're not getting what we agreed to and it's causing more headache for us.

And so we at that point decided to start looking

**into another provider that would meet the district's needs.**

Q. When did AISD terminate Broadspire's contract?

**A. Officially, I believe it just -- it just -- the partnership just ended in December of 2023. When we decided to not renew, we gave us time to put out a request and start looking for another vendor. But the district stayed with them through just a month ago.**

Q. Did you ever have any direct conversations or communications with Broadspire about Ms. Strife's application for a service dog?

**A. I did not.**

Q. Did you direct Mindy Smith to have any conversations or communications with Broadspire about Ms. Strife's application for a service dog?

**A. I did not direct her to do that, no.**

Q. Did Broadspire ever provide to you, either directly or through Mindy Smith, an accounting of its conduct with respect to Ms. Strife's application for a service dog?

**A. Could you restate the question? I want to make sure I understand you. You said the conduct. Are you asking --**

Q. Yeah, let me restate the question.

Did Broadspire ever provide to AISD an accounting

of its conduct of -- with respect to Ms. Strife's application for a service dog?

**A. So I can't state that I know that they provided Mindy -- because she was the direct contact with Broadspire -- anything specific. What I can testify to is that I know Mindy did communicate with them because there was a situation in which -- I believe, which was one of the hurdles that we were having to go through where they closed -- they closed the case and it should have been open.**

**And so Mindy was like, "Why are they doing this?" I just remember she was upset. And so she told me she was reaching out to them to fix that, and so I do know or remember that part. But I don't know if they gave anything to her in writing or reported anything to her.**

Q. Now, you referred earlier in your deposition to an entity called the employee accommodations committee. Do you recall that?

**A. Yes, sir.**

Q. In the time frame of September 2022 through March 1 of 2023, did Aldine ISD have something called the employee accommodations committee?

**A. Can you repeat those dates again? I want to make sure I'm answering correctly.**

Q. The period of September 1st, 2022, through March

1st of 2023, did the AISD have something called the employee accommodations committee?

**A. Yes, sir.**

Q. What was the employee accommodation committee's task in that time period?

**A. Yeah. So any time we had an employee submit for a -- a request for accommodation, we convened the accommodations committee; and I believe per the calendar you showed, I believe they were on Fridays. It was a standing calendar invite. I will say we didn't meet every Friday because we didn't have one every Friday; but when we did, Mindy and/or the assistant director, Richard Kelly -- depending if Mindy was there or handling it or if Richard Kelly was handling it -- would present to the committee the facts and we would try to work through a decision; or, as in this case, the committee would have some more questions and we would send Mindy or Richard back and say, "Okay. We don't feel we have sufficient information to make an informed decision. So let's try to get more."**

**Or the second question we always ask, "Is this the only accommodation or are there alternatives?" And that was just a standing question that we would ask of anybody who submitted for an accommodation.**

Q. Who formed the employee accommodations committee

at AISD?

A. So it was -- so there was -- how do I -- I guess let me state this and hopefully I can clean it up. So during the pandemic -- or during COVID is when we really started. I know there was one prior to that; but from my knowledge -- I had been in the role for about a year and a half -- I was not included as the chief of HR. And then the pandemic hit, and that's when we started getting a number of requests for accommodations.

And so our director of benefits at the time, LaMeka Martin, said, "Okay. We're going to -- you know, through the guidance of our general counsel, this is how we should do this."

And so that's how we did the accommodations committee and we put it on our calendar for every Friday. And whether we met or not, you know, if we didn't meet, we got the gift of time, right? So we used it every Friday during the pandemic.

And then of course, you know, we had opportunity to get out of the pandemic, thank goodness; and then we just -- and so but we continued it since then and I believe it's still going on. I don't know. I'm not in the human resource department anymore, but to my understanding it continues still to today.

Q. Did you in your capacity as the chief human

resources officer direct the creation of the employee accommodations committee?

**A. I did not direct it, no.**

Q. Who did direct that that committee be formed?

**A. I don't recall anybody. I think it just happened naturally because of the pandemic and that's when the director came to me and I said, "Okay. Well, how are we going to do this?"**

**And through guidance from our legal department, they said, "This is what you should do." And so we developed it.**

Q. Did the employee accommodations committee ever have any written policies or procedures?

**A. There's -- oh, goodness. I haven't seen those in a while. When we created it, I know LaMeka Martin shared documents and basically of what employees should be submitting, because at the time we weren't with Broadspire, we were with a different vendor. And so when employees would request an accommodation or apply for an accommodation, as some people say, there was no official document. And so she created the documents, you know, what needed to be filled out, you know, this is the information we need. And so that was created at the time.**

**And then we transitioned to Broadspire. One of**

**the reasons that we transitioned from one vendor to Broadspire, again, Broadspire made all these promises and they made it seem like they were going to be able to assist us in streamlining the process, making it user friendly to our employees to request accommodations. They would take part in the -- or actually lead the interactive process and so forth; however, unfortunately, none of that came to fruition as we started working with them.**

Q. What was Broadspire's role supposed to be with respect to leading the interactive process?

**A. So what I was told was that they were going to do the interactive process and then come to us with their recommendation and give us all the documentation and so that we can -- and, of course, we get to decide the, you know, are we going to move forward with the recommendation or not.**

**Like they didn't have that say-so, but basically they were just going to tell us, "Hey, this is what we recommend and here's all the supporting documentation, this is the work we've done," and then we were set to go from there.**

Q. So in -- in its, AISD's, original communications and understanding with Broadspire, Broadspire was to conduct the interactive process for an AISD employee

applying for a reasonable accommodation; is that correct?

**A. That is correct.**

Q. And presumably, since Broadspire was to lead the interactive process, there would not be a need for an accommodations committee; was that at least the concept initially?

**A. It would -- it was to alleviate the accommodations committee, you know, because they -- we would still have an accommodations committee, but we weren't going to spend hours talking about one case and having to go back and forth, right? It was by the time it got to the accommodations committee, they would have gone back and forth with the employee and got all the information with a final recommendation.**

Q. When did AISD determine that Broadspire was not leading the employee -- the interactive process to AISD's satisfaction?

**A. This is one of the first cases that triggered that for us. There was a couple of other cases. Because we had just started with Broadspire, we may have had them four or five months before this case.**

Q. When you refer to this case, are you referring to Ms. Strife's case?

**A. Ms. Strife's case, yes, sir.**

Q. Who appointed the members of AISD's employee accommodations committee?

**A. So initially it was LaMeka Martin who was the director of benefits at the time. She got the committee together and then some people stepped away from the district; and so then when Mindy took over the role as -- you know, she was director of benefits for a short minute and then she became executive director of total rewards, which includes benefits -- we needed to convene the accommodations committee and so we discussed and I gave her some recommendations and we went from there.**

Q. When you say you "gave her some recommendations," you're saying that you gave Mindy Smith recommendations as to who should be on the employee accommodations committee?

**A. Correct.**

Q. And what were the recommendations that you gave Ms. Smith as to who should be on the employee accommodations committee?

**A. So I told her that in the past we had a nurse, an RN who works in the district, who -- I gave her the name of who was on it before, because she was very savvy and she knew quite a lot, you know, in the medical field than we do -- or than I do as an educator.**

**However, that nurse wasn't on there; and actually**

Mindy was like, "Well, why are we going to the school nurse when we have an RN who's our director of health services?" And so she said, "I think that would be a better person."

I said, "You know, you're absolutely right." And so that's how we got our director of health services included on there.

I told her that we needed to make sure to include someone from the operations staffing side, meaning -- the way HR is set up is we have a staffing team that supports the school side, which is half of our employees of the district. But they seem to get all the attention, right, when you talk about teachers, because they're the largest employee group; but we tend to always forget that half of our employees are operation side, whether it's transportation, child nutrition, custodial services, and they need to be represented as well.

And so I said, "One thing I learned from the past is instead of inviting someone when need be from that side, let's just put them on the committee full time." And so we added two individuals that were on the operations side. And so that was sort of the conversations we had in developing the committee.

Of course, I would be on there, as chief of HR;

**and then Richard Kelly would also be on there as the assistant director of benefits, because he also stepped in in her absence.**

Q. Anyone else that you recommended to Ms. Smith?

**A. Let me see. There was myself, there was Mindy, Richard -- no, the two from operations and myself. There were six of us on the committee. That's all six of us.**

Q. And the director of health services, is that Angela Singletary?

**A. Yes, sir.**

Q. And who were the two individuals on the operations side that were on the committee, at least after Mindy Smith took over running that committee?

**A. Torivio Trevino -- I can't say it without doing the accent -- Tory Trevino, he's -- what's his title? He's the manager of auxiliary staffing, I believe is his title.**

**And then Dr. Keena Bradley, she's the -- she's his supervisor. She's the executive director of employee experience and professional standards. And she is also a former -- or the former director of benefits from many years ago. And so I recommended her just for her historical or institutional knowledge and her knowing the work in the benefits department.**

Q. Did you mandate that the members of the employee accommodations committee have any training or education with respect to the ADA as a prerequisite to their serving on the committee?

**A. I wouldn't say I mandated it; but we -- and the reason I don't say I mandated, it was just that when we developed this, our general counsel basically told me that we need to make sure that everybody does that. And so she trained us before we convened the accommodations committee.**

Q. What type of training -- when you refer to the general counsel, who are you referring to, Ms. DeWalt?

**A. Kaye DeWalt.**

Q. What training did Ms. DeWalt provide to the employee accommodations committee members before they began serving on the committee?

**A. I'm trying to remember how the training went. I know it was via Zoom. She did a presentation. And it was more in line with what our role is, why we would keep employees' names out of it and, you know, keep everything private. And just how we had to practice discretion and leave our personal biases, if we had any, out of it. I mean, it was a couple -- it was like a two-hour training with her in that instant.**

Q. Did Ms. DeWalt present any information on what

the ADA requires as part of this training, this two-hour Zoom training?

**A. I recall her talking to us about ADA, but I don't remember the specifics. I'd have to go back and review the presentation.**

Q. Is there an actual PowerPoint, some sort of presentation that Ms. DeWalt gave to the committee?

**A. She -- what was I guess on the screen were the documents that I shared with you that LaMeka Martin -- you know, was basically letting us know, like, why these documents have to be filled out, what's the information, and referred to ADA on the documents. So not an actual -- I don't recall it being a formal presentation. She was just reviewing the documents and talking about the documents, from what I recall.**

Q. You just mentioned Ms. Martin, but if I -- as I understood your testimony, Ms. Martin was the initial head of the committee before she went off and Mindy Smith replaced her; is that right?

**A. Correct.**

Q. And when Mindy Smith replaced Ms. Martin, you then recommended to Mindy Smith a new slate of members -- or at least some new members to come onto the committee; is that right?

**A. Correct.**

Q. Did Kaye DeWalt provide any training to those new members before they went on and served on the employee accommodations committee?

**A. I believe so, because I remember having a conversation with her and I remember that I couldn't make the meeting. I want to say yes.**

Q. You want to say yes, but do you recall any specific training that you attended with those new committee members where that training was presented?

**A. I did not, no.**

Q. Now, is Tory Trevino, does he -- or she, is it a woman or a man?

**A. He's a man.**

Q. Does Mr. Trevino have any legal or medical background?

**A. No.**

Q. Does Keena Bradley have any legal or medical background?

**A. No.**

Q. Does Richard Kelly, to your knowledge, have any legal or medical background?

**A. No.**

Q. When the employee accommodations committee was meeting to consider employee -- AISD employee requests for reasonable accommodation, were there minutes made of

the meetings?

**A. Should have been. I assume that either Richard or Mindy or at the time LaMeka was taking them. Because when we would reconvene, in a case where we had questions and we wanted more information, we would come back and it would be reported: As you recall, we met on this date, the committee had these questions. Since then we've been able to communicate with the employee and get this information, and so on and so forth.**

**So I didn't see them because, again, they were via Zoom. I wasn't there. But I'm assuming because of the way the meetings were ran, how else could you do that unless you took meetings -- or minutes.**

Q. Were the meetings recorded, the employee accommodations committee meetings recorded, to your knowledge?

**A. I'm not aware. I'm not sure.**

Q. Did you attend any employee accommodations committee meetings where Ms. Strife's application for a service dog was discussed?

**A. Yes.**

Q. How many meetings do you recall attending -- employee accommodation committee meetings do you recall attending where Ms. Strife's application for a service dog was discussed?

**A. I want to say probably three. I thought about that last night. I know the -- so probably three.**

Q. Are those on your calendar or do you have any definitive way of telling the Court which dates of those meetings where Ms. Strife's application was discussed?

**A. No, because on my calendar it just says accommodations committee. We don't list the names of who they're about.**

Q. What do you recall about those three meetings -- and let's start with the first of the three meetings. What do you recall was discussed about Ms. Strife's application for a service dog?

**A. Yeah. So the first meeting, the first accommodations committee meeting where we discussed Ms. Strife's case was in September of 2022. And it was presented that we have an employee who is requesting a service animal. A copy of -- there was a copy of a document or of a letter from -- I think it was an organization called The Rescue for PTSD, that what was submitted that Alisha was -- I don't if you'd say awarded a dog, and the dog is going to have special training, along with the employee, and so forth. And so -- and that the employee was requesting a service dog.**

**And so the committee had questions as to why does**

**she need a service dog, to perform what tasks, you know, just -- it just said she wanted a service dog. And so that left us with, well, why? What is it that she needs a service dog for? Didn't -- didn't list any limitations or anything like that. So that was the first question that the committee had.**

**And then of course the second question, as we ask of -- it's kind of a standard question when we look at any accommodations, is that the only accommodation for the employee or are there alternative accommodations.**

**And so we spoke about that as a committee; and then Mindy, I assume from there, went and spoke with Alisha and saying this is what the committee says. And that's when we started, I guess, seeking specific information from her physicians and so forth.**

Q. That brings me to a question regarding the conduct of the meetings. So when you -- when the employee accommodations committee was meeting about Ms. Strife, was the committee provided with copies of -- you said the letter, for example, that Rescue for PTSD sent, was the committee provided with a copy of that letter?

**A. No. It was just spoken to the committee about.**

Q. So they weren't even provided with a redacted copy; meaning, with the name of the -- of Ms. Strife

blacked out, but the substance of the letter was presented to the committee? That was not done; is that correct?

**A. The letter was read without her mentioning her name to the committee.**

Q. Okay. So in subsequent meetings, you said there were two other meetings where Ms. Strife, her application for a service dog was discussed, to your recollection. Were the actual documents presented to the committee members in those other two meetings, without her name being read or --

**A. No.**

Q. -- or were no documents presented?

**A. No documents were presented to the committee.**

Q. And no documents were read to the committee in those meetings?

**A. So the -- so the second meeting was more where we discussed Ms. Strife, or Alisha, was just as, you know, we have a pending case, we still haven't been able to get more information, so we're still working on it. So that was -- it was as simple as that, and then we move on.**

**And then the final meeting is when we were able to convene the accommodations committee after all these months and inform -- and it was presented to the the**

committee, the final meeting before it was approved for her to have her service dog that -- I want to say -- I think it was in January of 2023 -- getting my -- yes, January of 2023, it was presented to the committee that we received documentation from -- I want to say -- I don't think it was -- I think it was a physical therapist, I can't remember, from the VA hospital and on there it indicates the -- Alisha's physical limitations.

So we presented that to the committee that we finally now know, because until then all we had been told this whole time was that -- just that it's being recommended that she have a service dog. But we had not been told or what is it that -- what physical limitations does she have, why does she need the dog, no -- so that was from the VA hospital. The thing that was missing from that, though, was it didn't state anything about alternative accommodations.

However, shortly after that we -- when I say "we," the district, our legal -- our general counsel, received a letter from you, I guess, in response to another letter -- and I -- I don't know if that was both with Cory and -- Cory Rush and Ms. DeWalt. I don't know who wrote that -- wrote to you or just Kaye DeWalt. But in your response there was a statement in there where you indicated that no alternative accommodation would

**work; it needs to be the dog.**

**And so when we got that, that was the first time that we ever -- anybody's ever addressed the alternative accommodations. And so we presented that -- you, as her representative, we presented that to the -- I say "we," Mindy presented that to the accommodations committee that we now have the physical limitations that Alisha has; we also have a statement from her representative saying that, no, there's no alternatives but the dog; and then the committee said, okay, she gets the dog.**

Q. Now, Dr. Villarreal, you said that there was confidentiality as to the identity of the employee requesting an accommodation, at least with respect to the employee accommodations committee, right?

**A. Right.**

Q. But you were a member of the committee, were you not?

**A. I was, yes.**

Q. And Mindy Smith was a member of the committee, was she not?

**A. Correct.**

Q. Kaye DeWalt was in attendance at some of the committee meetings, was she not?

**A. She would attend some of them -- I can't tell you if she was in any of the ones that we discussed**

**Ms. Strife. It was a hit and miss whenever she was available or that we needed her there. So I -- I can't testify that I know she was there for Ms. Strife's.**

Q. You and Ms. Smith both knew ahead of the committee meetings the identity of the individual who was going to be discussed with the committee, did you not?

**A. I did for this case, yes.**

Q. And Ms. Smith knew for this case as well, did she not?

**A. Well, Ms. Smith would know them for all the cases because she led the committee.**

Q. And if Ms. DeWalt was involved in any of the committee meetings, she would have known the identity of the individual, would she have not have?

**A. That's not necessarily an accurate statement. I know that we've had several accommodation committees where she's come in and she's heard just like the rest of us, inviting us in that manner; but she's not privy to it just because she's general counsel, no.**

Q. Dr. Villarreal, do you believe that a committee composed mostly of laypeople -- meaning non-medical, non-lawyers -- should be making decisions of the magnitude this committee is making with respect to compliance with the ADA?

MR. RUSH: Object to form.
**A. I believe our committee --**
MR. RUSH: You can answer.
**A. I'm sorry?**
MR. RUSH: You can answer, if you can.
**A. Yeah, I believe the committee consists of the members that have the ability to make what we feel is the best informed decisions for our organization.**
Q. (BY MR. NEWAR) Despite the fact that almost all of them, with the exception of you and the nurse -- or rather Ms. DeWalt and the nurse, have no legal or medical training; is that your testimony?
**A. Yes.**
Q. Did you ever instruct Ms. Smith to send the committee members to outside training or inside training, aside from this sort of Zoom presentation that Ms. DeWalt gave regarding the ADA?
**A. No.**
Q. And to your knowledge, none of these committee members got any other training on the ADA other than this Zoom presentation that Ms. DeWalt gave; is that correct?
**A. Correct.**
Q. Dr. Villarreal, were you aware that in October of 2022, Mindy Smith went in person to the VA hospital in

Houston, Texas, to try to question Ms. Strife's doctors about her application for a service dog?

**A. Yes.**

Q. How are you aware of that?

**A. Well, as her supervisor and this was a pending case, we were -- we -- as I testified earlier, we were -- had concerns about Broadspire not fulfilling the interactive process. And so Mindy was like, "Okay, well, let me see what I can find out."**

**And I guess I -- your question was if she went over there -- if I was aware that she went over there about the service dog. I believe -- I guess so -- I believe she went over there to get more information about her medical records to see -- to support the medical dog, not necessarily that they were saying that they would give her the medical dog. I don't know if that makes sense.**

**It was more she was in search of medical reasons or, you know, because we did not have any information about what medical -- why, you know, why a service dog was needed, whether it's medical reasons, physical limitations, and so forth.**

Q. Did Ms. Smith tell you before she went to the VA that she was going to go to the VA or to question Ms. Strife's doctors?

**A. Yes.**

Q. And did you approve her doing so?

**A. I supported her. I wouldn't say that I approved or denied. I just said, "Oh, well, you can get us the information we need so we can move on with this."**

Q. Did you inquire of Ms. Smith whether AISD had a HIPAA release or other medical authorization form before you supported her going to the VA?

**A. No.**

MR. NEWAR: All right. Dr. Villarreal, we've been going for a little over an hour and a half or so, right about an hour and a half. I think we'll go ahead and take a little bit of a break, give you an opportunity to stretch your legs and the court reporter to stretch her hands. Then we'll come back here in about ten minutes. Is that okay with you?

THE WITNESS: That's fine.

MR. NEWAR: Okay.

(Recess from 2:28 p.m. to 2:46 p.m.)

Q. (BY MR. NEWAR) All right, Dr. Villarreal, we're back from break.

I want to have Candice, my paralegal, pull up a document for you to look at -- well, before we do, Dr. Villarreal, were you aware that in the November time frame, Patricia Guidry, director of risk management, got

involved in Ms. Strife's case involving the request for a service dog?

**A. No, I don't recall then.**

Q. Okay. Do you know who Patricia Guidry is?

**A. Our director of risk management.**

Q. Did you supervise Patricia Guidry back in November of 2022?

**A. No.**

Q. I'm going to show you a document that's been produced by AISD in this case.

MR. NEWAR: It's there at the bottom, Candice, if you can make that bigger. Appreciate it. Okay. So it's -- move the -- there we go.

Q. (BY MR. NEWAR) AISD 618 and 619 is the next page. See that? So make it smaller -- okay, Candice -- I mean, Dr. Villarreal, this is an email from Patricia Guidry dated November the 9th of 2022 to Eric Palmer at TASB, with a cc to Mindy Smith.

And the first line -- the first paragraph reads, quote: Eric, good morning. The district would like to refer two employees who have not had a work injury for evaluation of their medical condition and their accommodations request for service animals. Is there a peer review doctor/designated doctor in Houston that TASB recommends to evaluate service animal accommodation

requests?

Do you see that language, sir?

**A. Yes, sir.**

Q. Okay. And then it goes on to state that the two employees have the following conditions, and then it states: One, anxiety, PTSD. Two, PTSD, bone disorder, traumatic brain injury causing balance issues.

Have you ever seen this email before today?

**A. No.**

Q. And you were not aware that Ms. Guidry sent it at the time, November the 9th of 2022?

**A. No.**

Q. Okay. Were you ever informed by Ms. Smith that she or Ms. Guidry were going to reach out to TASB for information regarding Ms. Strife's case?

**A. I was not made aware that Ms. Guidry was involved. I know when we started talking about, you know, the pending item and like so what do we think about having them see one of our physicians, Mindy said she would look into it.**

**What that meant, I mean, I assume she was going to look at board policy and things like that. But this seems -- you know, we do get advice from TASB, so I don't see anything out of the ordinary in reaching out to them for advice.**

Q. Okay. But you were not aware of this at all; is that correct?
**A. No.**
Q. Meaning I am correct, you were not aware?
**A. Correct, you are correct.**
Q. All right. We're going to show you some additional documents here now.
MR. NEWAR: Candice, would you put up on the screen the letter from Jennifer O'Connell, which is AISD 003.
Q. (BY MR. NEWAR) All right. Dr. Villarreal, this is a letter that was sent to the -- well, it says To Whom It May Concern, but it was sent by Jennifer O'Connell, vice president of The Rescue for PTSD.
MR. NEWAR: If you could make that bigger, Candice.
Q. (BY MR. NEWAR) And that involves Ms. Strife, and have you ever seen this letter before?
**A. Yes.**
Q. When did you first see it?
**A. I would say around the time that it was submitted. So I would say in September of 2022 it was submitted, and this was a conversation that I had with Mindy Smith about it.**
Q. What conversation did you have with Mindy Smith

about this letter?

**A. Mindy Smith informed me that she had spoken to Ms. Strife, and Ms. Strife was requesting a service animal.**

**And I said, oh, okay.**

**And she said, look, she -- and she showed me this letter. And I made sure to let Mindy know, because at the time Mindy had just been in her role for a couple of months, Alisha had just been in her role in HR for a couple of months, and so I made sure to let Mindy know, I said, "Make sure that you inform Alisha that she needs to follow the same protocol just like any other employee. Just because she's on our team in HR, she can't circumvent the situation."**

**And so that's the conversation we had with this.**

**And then I believe it was after that, I assume, that Mindy then talked to her and that's when Alisha submitted her request through Broadspire.**

Q. Did you ever contact or direct Mindy Smith to contact Jennifer O'Connell at Rescue for PTSD in response to this letter?

**A. No.**

Q. So you never spoke or otherwise communicated with Jennifer O'Connell about Ms. O'Connell's letter of September the 5th of 2022; is that correct?

**A. Correct.**

Q. And you never communicated or -- either in writing or orally with Ms. O'Connell about Ms. Strife at all; is that correct?

**A. That is correct.**

Q. All right. Is this the letter that was read to the committee in September of 2022 without Ms. Strife's name being revealed?

**A. I believe, yes.**

Q. I want to now show you -- by the way, before I do that, Dr. Villarreal, did -- when you first got this letter and saw this letter from Ms. O'Connell, did you -- did you and Ms. Smith discuss the reason for Ms. Strife requesting the service dog?

**A. The conversation was about -- she came in, she goes, "Oh, by the way, I was talking to Alisha. She's been given the service dog. She's going to request an accommodation."**

**And she showed me the letter, I read it, and then we had the conversation like, "Okay, she needs to go through Broadspire." And it was as simple as that. But we didn't go into detail as to -- I may have said, "Oh, I wonder why she needs a service dog," and, you know, this doesn't say why. And so we said go through the accommodation committee.**

Q. Did you understand at some point that Ms. Strife was requesting the service dog because of PTSD?

**A. Somewhat, I believe -- I'm trying to, in my head, picture the first documentation we got on the request for a service dog. But I don't know that I personally was clear initially that it was for PTSD.**

Q. At some point, though, you became aware and understood that it was for PTSD?

**A. You know, I can't say that. All I can say is for me personally, as part of the committee, all I knew was that she was requesting a service dog. I had no idea what's the service dog for or why, what is it that she can't do, you know, is there something going on at work that she's not able to fulfill without the service dog -- I just -- I just had all those questions. And so it wasn't, again, until we got the documentation from the VA hospital that it indicated physical limitations.**

**I will say I did read on several things or was presented as to PTSD, but I didn't see why that would have anything to do with her job. Me personally.**

Q. You know anybody who -- in your life, have you ever come across anyone who has had PTSD?

**A. Yes.**

Q. Who?

**A. Close family members. As a school counselor,**

**there were students that were diagnosed with that, that I worked with, yes.**

Q. In your experience with close family members or children that you worked with as a school counselor, was it your experience that PTSD could be a disability?

**A. You could say that -- yes.**

Q. In fact, as a school counselor, I assume that you were involved in ARD meetings where children who were suffering from PTSD were given accommodations because of their PTSD; isn't that true?

**A. I don't recall sitting in any ARD meetings as a school counselor that we dealt -- that -- that decisions were made, me personally, no, I did not.**

Q. In your experience as a -- whether at Fort Bend ISD or AISD, have there been any employees, other than Ms. Strife, who have sought accommodations for PTSD?

**A. That's a great question. I don't remember us ever discussing anybody with accommodations for PTSD, but there has been so many; during COVID, there was hundreds. And so I -- unless I can look at documentation and I could say, "Oh, yes, I was part of that," I don't want to say the wrong thing. But from my knowledge right now, I don't recall.**

Q. All right.

MR. NEWAR: Candice, would you please put up

on the screen the September 22nd letter of Dr. Lisa Miller, which is AISD 133. AISD 133. Right there.

Q. (BY MR. NEWAR) Okay. Dr. Villarreal, I'm showing you now a document that has been Bates stamped --

MR. NEWAR: If you can go down to the bottom, Candice.

Q. (BY MR. NEWAR) There you'll see -- okay. I said AISD 133. It's Strife 133.

This is a letter, Dr. Villarreal, that comes from somebody named Dr. Lisa Miller, and it's sent on Department of Veterans Affairs letterhead, To Whom It May Concern, regarding Ms. Alisha Strife or Mrs. Alisha Strife.

Have you ever seen this letter before?

**A. Yes.**

Q. When did you first see this letter?

**A. I would say it had to have been around the time we received it in -- that September date.**

Q. Okay. And so you know from the first paragraph of this letter that Dr. Lisa Miller informed the recipient of this letter that Ms. Strife was a disabled veteran, carrying the service-connected diagnoses of post-traumatic stress disorder, as well as traumatic brain injury which affects her balance.

Do you see that language, sir?

**A. Yes, uh-huh.**

Q. So you knew, in fact, on or about September the 22nd of 2022 that Ms. Strife had been diagnosed with PTSD; is that right?

**A. Yes.**

Q. Okay. And further down on that letter, the -- Dr. Miller tells the recipient that the -- that Ms. Strife needs a service dog to work. Do you see that? Final paragraph? Is that right?

**A. It does -- it does say: Please allow the service dog to accompany her to work.**

Q. And it says that the dog provides -- in the paragraph right before it, the letter from Dr. Miller states exactly what the dog does; isn't that true?

**A. Yes.**

Q. After you received this letter on or about September the 22nd -- by the way, how did you receive this letter? Who gave it to you?

**A. It was a conversation between Mindy Smith and myself.**

Q. So Mindy Smith would have given you the letter?

**A. She showed me the letter, yes.**

Q. Okay. What was the conversation that you had with Mindy Smith after she showed you this letter on or

about September the 22nd of 2022?

**A. So there was a couple of things with this letter that I recall. If you can scroll to the bottom, what stood out to me was that this was a pharmacist who was giving this diagnosis, if you will.**

**And then although it states about balancing and so forth, it -- I still had the questions, okay, can we get more specifics from a physician about her physical limitations? Because this is from a pharmacist, not a physician.**

Q. Where in the letter does Dr. Miller say that she's a pharmacist?

**A. Well, after her name, it says PharmD.**

Q. What does PharmD stand for, Dr. Villarreal?

**A. Doctor of Pharmacy.**

Q. Okay. Do you believe that that's the same thing as a pharmacist?

**A. Yes.**

Q. Why do you believe that?

**A. I have a cousin who's a pharmacist, and I know that he's a doctor of pharmacy.**

Q. Did you reach out to your cousin who's a pharmacist about this letter?

**A. No.**

Q. Did you ever discuss this letter or the PharmD

designation with your cousin or with anyone else?

**A. Besides Mindy Smith, no.**

Q. There are some other designations next to Dr. Miller's name besides PharmD. It says BCPP and BCGP. Do you see those designations?

**A. I see those, yes.**

Q. Did you make any effort to determine what those meant?

**A. I know at the time -- I know Mindy did when we discussed it. I don't recall what those -- what those mean right now. I don't remember.**

Q. Did you research Dr. Miller's credentials anywhere on the internet or anywhere else after receiving this letter from Ms. Smith?

**A. I personally did not, no.**

Q. Are you aware of the role that Dr. Miller -- did you ever become aware of the actual role, the actual duties that Dr. Miller discharged at -- at the VA in her capacity as an employee there?

**A. I recall that -- I'm not sure what sparked her to respond to something, but I know Dr. Miller wrote a letter -- there's another letter from Dr. Miller explaining her role and so forth. I recall that. But I don't -- I don't remember what specifically it said.**

**I do also want to point out on this letter what**

**other thing that stood out was this letter was submitted, but there's not a signature on it as well.**

Q. Does -- in every case in which an employee seeking an accommodation at AISD submits a letter from a doctor, does AISD require that there be a handwritten signature by the doctor?

**A. Not necessarily, I'm not going to say that, no. I just -- it just stood out to me.**

**I do recall -- and I'm almost positive it says a physician, I think it uses the word "physician," and Dr. Miller is not a physician. That's what stood out to me as well.**

Q. Where does the word "physician" appear in this letter?

**A. It does not. I'm saying on documents and I believe that Broadspire should have -- is it on the -- I think on the job accommodation questionnaire -- is that what we call it? From what I recall, if it's that document or another document, that it says must be completed by a physician. And it has the word physician.**

Q. You believe that because you have read the job accommodation questionnaire before; is that why you believe it?

**A. Yes.**

Q. Is it possible you're mistaken in that regard?

**A. It could be that it may not be the actual job accommodation questionnaire. It could be a different document that's asked to be submitted. So yes, I could be mistaken.**

Q. Okay. But when you got this letter from Mindy Smith, did you and Ms. Smith decide that this letter was not sufficient for Ms. Strife to have her service dog request granted?

**A. I would say that we still had some questions because it still didn't tell us what physical limitations Ms. Strife had or why she needed a dog. So we wanted more information.**

Q. But the fact of the matter is that on or about September the 22nd of 2022, AISD did not approve Ms. Strife's request for a service dog, even though they had this letter from Dr. Miller; isn't that true?

**A. That is correct.**

Q. All right.

MR. NEWAR: Now, let's go to AISD -- or maybe it's Strife 132, Candice. It's the September 29th letter from Dr. Mann.

Q. (BY MR. NEWAR) Okay. So now, Dr. Villarreal, I'm going to show you what's been marked as Strife 132. You see those numbers at the bottom right corner?

**A. Yes, sir.**

Q. Okay.

MR. NEWAR: Let's go ahead and make that language bigger for Dr. Mann.

Q. (BY MR. NEWAR) All right, Dr. Villarreal -- I'm sorry, Dr. Villarreal.

Dr. Villarreal, this is a September 29th letter from someone by the name of Dr. -- go down, Candice -- Gurtej S. Mann MD, psychiatrist. Do you see that?

**A. I do.**

Q. Okay. When did you first see this letter -- or did you -- have you seen this letter before today?

**A. Yes.**

Q. When did you first see this letter?

**A. I would say around the time that Mindy Smith received it, which I don't recall -- if you go down, I can see the date, so around that date. September the 29th.**

Q. Did Mindy Smith present this letter to you also like she did with Dr. Miller's September 22nd letter?

**A. Yes, she did.**

Q. Did you read it on or about September the 29th?

**A. Yes.**

Q. When you read this letter from Dr. Gurtej Mann, did you discuss the letter with Dr. -- with Mindy Smith?

**A. Yes.**

Q. What did you discuss with Ms. Smith at that time on or about September the 29th of 2022?

**A. We discussed that this letter was the exact verbiage of the letter from Dr. Miller. And, not sure if it was right -- if it was after, if we had a second discussion, that she had spoken with Ms. -- with Alisha, and I was told that Alisha stated to her that she wrote them both -- the letter and just had them sign. And so that's why it was identical.**

Q. So Mindy Smith told you that she, being Mindy Smith, spoke to Alisha about Dr. Mann's letter?

**A. Correct.**

Q. Okay. And do you see the bottom --

MR. NEWAR: Go to the bottom, Candice.

Q. (BY MR. NEWAR) Whose -- whose handwriting or whose signature appears there, Dr. Villarreal?

**A. Dr. Mann.**

Q. Okay. And did you -- did you ever question whether Dr. Mann believed that what he was saying in this letter was true and accurate from his perspective?

**A. No, I didn't question Dr. Mann. I -- I questioned why were the letters identical.**

Q. So what? What -- what difference --

MR. RUSH: Object to form.

Q. (BY MR. NEWAR) -- what difference did it make if the letters were identical, Dr. Villarreal?

**A. Well, I just found it interesting, I guess. But, again, it's the same letter and it still did not give us the information as to why she needed a service animal; nor did it tell us of any alternative accommodation.**

Q. So what? Why did it need to tell you of an alternative accommodation?

**A. Well, it did need to tell us what physical limitations that she had on why she would need a service dog to fulfill her job duties or her job responsibility.**

Q. What is -- what does it say in paragraph 2, Dr. Villarreal?

**A. (Reading) She has a service dog who is invaluable to her mental and physical health recovery. The dog has been professionally trained and offers the following: Counter-balance to help her with her balance so she does not fall, deep pressure therapy, and assisting with grounding in case she falls.**

Q. Does that not tell you the reasons that she needs the dog?

**A. In terms of a work environment? No.**

Q. Do you think standing upright while you're working is critical to performing a job?

**A. It depends on which job, how long you're standing**

**for.**

Q. Was being able to walk without falling part of Ms. Strife's job responsibilities?

**A. Walking isn't part of her responsibilities for her job. I think...**

Q. So if the dog helped prevent her from falling, wouldn't that be a sufficient reason for her to have a service dog?

**A. One could say that, if someone was falling all the time.**

Q. Did you ever make any effort to research what deep pressure therapy means?

**A. No.**

Q. Did you ever do any research to determine what the task of grounding is?

**A. That, I did. And I can't -- I don't want to verbatim and say it wrong, but that part I did because I had never heard of -- like assisting with grounding, what does "grounding" mean? And so I remember Googling that part.**

Q. What did you find when you Googled grounding with respect to a service dog?

**A. It was so long ago, I don't want -- since I'm under oath, I don't want to say the wrong thing. But I could say I still had questions on to -- I still would**

**like more information as to why Alisha needs a service dog specifically for -- for work and why can't she have a wheelchair or why can't she use a cane? Those are questions that I had.**

Q. As of September the 29th of 2022, neither you nor Mindy Smith nor anyone else at AISD approved Ms. Strife's request for a service dog; isn't that true?

**A. Correct.**

Q. All right.

MR. NEWAR: Candice, let's go to --

Q. (BY MR. NEWAR) Before we do -- before we go to the next document I was going to show you...

MR. NEWAR: Candice, would you pull up AISD 061, please. Go down, Candice, please, to the September 27th email, right there.

Q. (BY MR. NEWAR) Okay. Dr. Villarreal, I'm showing you what is Strife 061 to Strife 062, and it's an email chain. But the one I want to focus on is this email that was sent by Mindy Smith on September the 27th at 9:16 a.m. to Ms. Strife.

And it reads, quote: Alisha, I appreciate you sending this information to me and loading this in -- loading this in the Broadspire system. The letter is exactly what we need, but we need this from a medical doctor that is licensed to diagnose conditions. The

practitioner that is writing this letter is a pharmacist. Do you have a board certified and licensed physician that can provide this information?

Did I read that correctly?

**A. Yes.**

Q. Have you seen this email before?

**A. No.**

Q. Now, I'll represent to you that that was the email that was sent by Ms. Smith to Ms. Strife after Ms. Strife tendered the September 22nd letter of Dr. Miller.

So is that consistent with the conversation that you had with Ms. Smith where you said -- where you had questions about the fact that Dr. Miller was only, quote, unquote, a pharmacist?

**A. Correct.**

MR. NEWAR: So if you go down a little bit, Candice.

Q. (BY MR. NEWAR) You'll see that Ms. Smith -- Ms. Strife responded to Ms. Smith at about 9:21 on that same date and she told Ms. Smith that, quote: At the VA, she is my doctor. She is the one that gives me my medications.

And then she provides a link to an article that has to do with the VA providers. Do you see that?

**A. Uh-huh, I do.**

Q. So did Ms. Smith ever tell you that -- about the fact that -- or did she tell you anything at all about -- about whether Ms. -- whether Dr. Miller at the VA was considered a medical provider?

**A. I don't recall, no.**

Q. All right.

MR. NEWAR: Candice, let's go to the November 1st job accommodation questionnaire, which is AISD, I think, 07 -- oh, you've got it, okay.

Q. (BY MR. NEWAR) Now, Dr. Villarreal, I'm going to show you what is the job accommodation questionnaire that we've talked a little bit about throughout the day.

MR. NEWAR: Let me go from the beginning of the document, the first page, it's -- no, give us the Bates number, Candice. Yeah. It's Strife 080 and the final page of that would be Strife 082.

Q. (BY MR. NEWAR) Do you see that, Dr. Villarreal?

**A. Yes.**

Q. Okay. Have you ever seen this document before?

**A. Does not look familiar to me. I don't believe so.**

Q. Okay. Let me let you, then, read it, get a full opportunity to review it, so you can confirm that you've never seen it before.

MR. NEWAR: Candice, can you make it bigger in the front, please?

Q. (BY MR. NEWAR) Let us know when you finish the first page, Dr. Villarreal.

**A. (Examining document.) I've read what I can see on the --**

MR. NEWAR: You need to let him go down to the second, to the bottom there, Candice, let him read the bottom as well.

**A. (Examining document.) Okay.**

MR. NEWAR: And go to the next page, Candice.

**A. So I will say this page looks familiar to me. That first page doesn't, but I recall seeing this page in some -- at some point.**

MR. NEWAR: And go to the bottom, Candice and let him make sure he's...

Q. (BY MR. NEWAR) Are you finished reviewing this page, Strife 81, Dr. Villarreal?

**A. Yes.**

Q. Okay.

MR. NEWAR: Then go to the last page.

Q. (BY MR. NEWAR) Have you seen the last page of the job accommodation questionnaire?

**A. (Examining document.) Okay.**

Q. You haven't seen the last page, or have you seen it before?

**A. It does look familiar. I think the last two pages I -- so I must have seen the first one. I just don't recall. But I have seen the last two pages.**

Q. When did you see this -- you'll see the date here of Dr. Mann's signature -- if you go back up -- is 11/1 of 2022. Do you see that on Strife 81?

**A. Uh-huh.**

Q. When would you have seen this document either partly or entirely the first time?

**A. I would say this would be part of the conversations right before we made the decision to request for Alisha to go to Concentra. We were having the conversations about this because, again, this states basically what the letter stated.**

Q. If you go up to the top of the first page, rather, Dr. Mann says in the first answer to the question -- question 1: Please describe the physical or mental impairment or medical condition prompting the associate's request or need for a reasonable accommodation.

Do you see that, sir?

**A. Yes.**

Q. And Dr. Mann wrote: Major depression,

post-traumatic stress disorder, as well as traumatic brain injury which affects her balance. In addition, she has osteopenia and is prone to falling. Anxiety disorder.

Did that not tell you the medical condition that she had that necessitated a service dog?

**A. It told me that -- yes, that she has these conditions; but I still, personally, didn't see the physical limitations that would keep her from doing her job, is what I kept questioning.**

Q. What about psychological limitations, did it tell you anything at all about those, Dr. Villarreal?

**A. No. It talked about depression, post-traumatic stress disorder; however, there's alternatives -- there's other alternative accommodations besides a service dog, as well, for those.**

Q. What do you believe those accommodations to be, Dr. Villarreal?

**A. Therapy. As a -- as a former counselor, I know there's medication that people are on if that's the route you want to go. You know, there's a number of things.**

Q. Did AISD ever propose any accommodation for Dr. -- for Ms. Strife's anxiety disorder, major depression, and post-traumatic stress disorder?

**A. Can you ask that again? Did AISD --**

Q. Did AISD -- did AISD, in response to Ms. Strife's request for a service dog, ever propose any accommodation of any kind to Ms. Strife for her disabilities, physical or mental?

**A. Not that I'm aware of, no.**

MR. NEWAR: All right. Candice, let's go to Jennifer O'Connell's November 11th letter.

Q. (BY MR. NEWAR) Okay. Dr. Villarreal, we have now up on the screen a letter dated November the 11th of 2022; and it's from --

MR. NEWAR: If you go down to the bottom, Candice, it's Strife 08 -- 092. Keep going, Candice, to -- well, looks like it's out of order. Do you have the full letter, Candice, because that doesn't look like the full letter. We need the full letter.

I have the letter as being AISD 092, if you can -- but I don't -- there must be another page. So let's -- also, Candice, perhaps at AISD 127 and 128. That's not going to be in this stack. There it is.

Q. (BY MR. NEWAR) Okay. All right. So now we have the full letter up for you, Dr. Villarreal. This is November 11th of 2022, and it's AISD -- I'm sorry -- Strife 127, all the way down to -- let's go to the bottom -- Strife 128.

Dr. Villarreal, have you ever seen this letter before?

**A. Yes.**

Q. When did you first see this letter?

**A. It's -- it's an exhibit in the document that I reviewed to prepare for -- for today, or to refresh my memory, in the December -- is it December 6th, 2022, letter that you sent to our general counsel.**

Q. Did you see it -- then, I take it from your answer, you did not see it on or about November the 11th of 2022; is that right?

**A. No.**

Q. In this letter --

MR. NEWAR: Actually, let me go down to the second page, Candice, if you would.

Q. (BY MR. NEWAR) All right. This letter, in this letter at the final paragraph, or the paragraph -- the large paragraph before the final paragraph, Ms. O'Connell informs the district that AISD's directive to Ms. Strife that she undergo a medical examination violates the ADA. Do you see that?

**A. Yes.**

Q. And when you saw this letter on or about December the 6th or so, did you -- did you make any inquiries as to whether this medical examination requirement violated

the ADA?
MR. RUSH: Objection to the extent this calls for the revelation of attorney-client privileged communications.
Q. (BY MR. NEWAR) Yeah, I'm not asking if you talked with a lawyer about it. But did you independently discuss, for example, with Ms. Smith; or make any of your own investigation to determine whether the directive that had been given to Ms. Strife to undergo a medical exam violated the ADA?
**A. So I want to be clear. You just asked me when I read this or saw this in December of 2022. My testimony was that I reviewed your packet, and that was when I read it, which was a couple of days ago. So I did not testify that I read this back in December of 2022.**
Q. Okay. You --
**A. Although I --**
Q. I'm sorry. You just clarified something for me, but let's go ahead and -- I didn't mean to interrupt you. Go ahead.
**A. No, that's fine.**
Q. So -- so the packet -- I want to get this clear now. The December 6th letter from me that you're referring to, you didn't review that actually on December the 6th; you reviewed that in preparation for

your deposition, a few days ago?

**A. Correct.**

Q. Okay. So you didn't see my December 6th letter at the time of December the 6th; the first time you saw it was a few days ago when you were preparing for the deposition; is that accurate?

**A. Somewhat. On December the 6th or around there, I received it; however, I put it in a file and filed it away. I did not review any of it. I assumed it was being handled. So for the first time that I truly read it was a couple of days ago.**

Q. Okay.

MR. NEWAR: Candice, would you put up on the screen AISD 393 to 411, which is my letter to Dr. Goffney dated November the 18th.

MS. O'BRIEN: Did you say it was AISD 393?

MR. NEWAR: AISD 393 to 411, I believe.

MS. O'BRIEN: What date is your letter?

MR. NEWAR: November 18th.

Q. (BY MR. NEWAR) So, Dr. Villarreal, this is a letter that's Strife -- or I guess Strife -- Strife 378 through --

MR. NEWAR: Let's go all the way down, Candice, to Strife 393?

MS. O'BRIEN: 83.

MR. NEWAR: 383. Okay.

Q. (BY MR. NEWAR) Dr. Villarreal, have you ever seen this letter before?

**A. I believe that's an exhibit in the December 6th -- it looks like -- at this moment, I think I just -- there was some --**

THE WITNESS: Can you scroll down a little bit?

**A. I believe this is an exhibit in the December 6th letter as well.**

Q. (BY MR. NEWAR) Okay. So you would not have seen it at the time, November the 18th; is that correct?

**A. That is correct.**

Q. All right.

MR. NEWAR: And then, Candice, if you would put up my December 22nd letter to Ms. DeWalt.

Q. (BY MR. NEWAR) Okay. Dr. Villarreal, this is another letter that I sent to Ms. DeWalt, dated December 22nd of 2022. It's marked --

MS. O'BRIEN: I can share the marked one, but it doesn't have the exhibit.

MR. NEWAR: Oh, okay. This one actually doesn't have a Bates stamp number on it. But go ahead and go down to the end of the letter, Candice, if you would.

MS. O'BRIEN: (Scrolling.)
Q. (BY MR. NEWAR) There were some enclosures, obviously, with that letter. There were some exhibits.
Have you ever seen this letter before, Dr. Villarreal?
**A. Not this one. I think -- I mean it went so fast, but I think some of the exhibits may be the same as in the exhibits of December 6, but I'd have to review them more closely.**
Q. Okay.
MR. NEWAR: Give him an opportunity to read the -- bring the letter up clearly, Candice, so he can review the first page and the second page and see if he's seen this.
**A. (Examining document.)**
**I think some of that verbiage seems identical to the letter I wrote -- read from December the 6th.**
MR. NEWAR: Okay. Keep going, Candice, give him the second page so he can confirm whether he's seen this section.
**A. This content does look familiar. I think it was also included in what I've already read.**
Q. (BY MR. NEWAR) I'm just trying to -- I'm just trying to determine whether you saw this on or about December the 22nd.

**A. Oh, no. The first time I saw any of this was, like I stated, on December the 6th when that initial packet was sent to us, I must have printed it out and stuck it in a file because that's the file that I went to retrieve from my old office in HR; and it was all new to me when I reviewed it a couple of days ago.**

Q. Okay. Well, so if -- obviously if the packet that was accompanying what you said is a December 6th letter, this was a December 22nd letter, so I assume you would agree, by definition, it would not have been in the December 6th packet; is that right?

**A. Correct.**

Q. Okay. And so you don't remember seeing it any time after December the 6th; is that correct?

**A. That is correct.**

Q. Okay.

MR. NEWAR: All right. Candice, let's go to my January 11th, '23, letter to Ms. DeWalt. Go to the letter itself. Yeah.

Q. (BY MR. NEWAR) All right. Dr. Villarreal, we're showing you a letter dated January the 11th, 2023, to Ms. DeWalt from me.

MR. NEWAR: Can you bring it up? It's marked Strife 450, and it goes down to Strife -- there's some exhibits, Candice, make sure you get all the

exhibits.

Well, actually, let's make it easy, first, do it simple. Go back to the two-page letter itself. So -- okay. Strife 450 is the first page of the letter.

Q. (BY MR. NEWAR) Have you ever seen this letter before, Dr. Villarreal?

**A. No.**

MR. NEWAR: And go to the second page so he can fully see and attest that he hasn't seen it. Go to the signature.

Q. (BY MR. NEWAR) You've never seen this at all?

**A. (No response.)**

Q. Is that correct?

**A. That's correct.**

Q. Okay. All right.

MR. NEWAR: And then, Candice, let's pull up the February 24th letter -- okay.

Q. (BY MR. NEWAR) Dr. Villarreal, in front of you now on the screen is a letter dated February the 24th of 2023, and it's --

MR. NEWAR: Go down to the bottom, if you would, Candice.

Q. (BY MR. NEWAR) It's a letter from Mindy Smith to Ms. Strife and the last page is -- is it marked as a Bates stamp? Yes. So it's Strife -- the last page is

Strife 475.
Do you see that number, Dr. Villarreal?
**A. Yes.**
Q. And then the first page is Strife 472. Have you ever seen this letter before?
**A. Yes.**
Q. When did you first see this letter?
**A. This -- can you go to the top? I want to make sure I'm answering accurately. So this was around the time -- I believe this is -- isn't this where she -- yes, it is the approval letter. I thought that's what it was.**
**So I saw this letter around that date, because this was right after we met with the accommodations committee and granted the service dog.**
Q. So how did this letter come to you on -- after the committee approved the accommodation? Is that when it first came to you, after the committee met?
**A. Yes. So after the committee met, I spoke with Mindy and said, "Okay. Make sure that you communicate this as soon as possible with Alisha." And that's when this letter was developed.**
**And so probably the next day or so, I said, "How did -- have you communicated" and so forth; and she showed it to me.**

Q. Were you in the meeting on February the 24th when the committee met to approve Ms. Strife's accommodation -- service dog accommodation?

**A. I believe so, yes, uh-huh. Yes.**

Q. You were physically in attendance; is that right?

**A. It would have been via Zoom.**

Q. Oh, via Zoom, okay. And then who else was in attendance in that February 24th meeting?

**A. I mean it would be the six members. I can't tell you if all six were there. I don't recall unless I can go -- well, no, it's not even on the calendar.**

**But typically it was the six members, which would have been myself, Mindy Smith, Richard Kelly, Dr. Keena Bradley, Tory Trevino, and Angela Singletary.**

Q. And what was the conversation again that was discussed? Can you take us through the specific conversation that occurred -- first of all -- well, before we do that, how long did that meeting last, would you say?

**A. I'm trying to remember if there were other accommodations we had to speak about. I can't recall because, you know, we -- sometimes it was one, sometimes it was a number of them. I know when we spoke about this case, we spent a good, probably 20 minutes informing the committee of the new information that we**

**had.**

Q. Who is the "we" that you say was informing the committee of the new information?

**A. The -- ask that again. I want to make sure I answer correctly.**

Q. You said "we" spent about 20 minutes informing the committee of the new information. Who is the "we" you were referring to?

**A. Actually it was Mindy. I say "we" because I was privy to the information before, but I'm not the one who shared it out. Mindy Smith shared it with the committee.**

Q. You say you were privy to the new information. What new information were you privy to before you met with the committee on February the 24th?

**A. So before we met in February with the accommodations committee, what was left as pending was, one, what are physical limitations? We didn't have anything, from when we met back in September, that told us what the physical limitations were. We didn't -- hadn't spoken to any of her physicians, nor did we have anyone ever speak about any alternative accommodations.**

**And so by this time, we had received a report from the VA hospital that stated physical limitations and why she needed the service dog.**

**And then there was a letter from you -- and, again, I can't remember if it was to both Cory Rush and our general counsel or just to our general counsel; but in that, you, as her representative, stated that no other alternatives would work, it had to be the dog -- or something of that nature.**

**And so we presented those -- that information to the committee and it was like, "Okay. It's clear to us now. She gets the dog."**

MR. NEWAR: Candice, would you pull up AISD 109 to 114. It's Dr. Vandeven's report from January the 10th of 2023.

Q. (BY MR. NEWAR) Dr. Villarreal, I'm going to show you what has been marked previously as -- let's see -- Strife 109.

MR. NEWAR: Can you make it bigger, Candice? Go to the top so he can see the page. Is that the first page or what is the 108 -- what is 108 and 107, is that the first page? Okay.

107 going down through -- let's go to the end of the document, which appears to be 114, I think. Keep going to the bottom. Okay.

Q. (BY MR. NEWAR) Strife 107 to 114, Dr. Villarreal, is a document I will represent to you was authored by Sheryl Vandeven. You will see her name

there at the bottom of 114, DPT, NCS, Doctor of Physical Therapy.

Do you see that language, sir?

**A. Yes.**

Q. Okay.

MR. NEWAR: And if you go back up towards the -- towards 109, Candice, let's go to Strife 109. Actually, no. Go to 110. Go to the first substantive page of the document. Keep going. Okay, right there.

Q. (BY MR. NEWAR) All right. So this, Dr. Villarreal, is the first substantive page of Dr. Vandeven's report and it says -- there's a date of a treatment plan and it's January the 10th of 2023. Do you see that date there, sir?

**A. Yes.**

Q. Okay. And this is an examination or the results of an examination that was done by Dr. Vandeven of Ms. Strife at the VA clinic. And if you go down to 110 through 111, you will see her physical findings that --

MR. NEWAR: Keep going, Candice, please. Keep going down to -- I want to go down to -- okay, right here.

Q. (BY MR. NEWAR) And then on page Strife -- looks like Strife 112, you will see in the body there it refers to why -- keep going up a little bit, Candice --

why this dog, whose name is "Independence," what tasks this dog performs. Do you see that, 1 through 6?

**A. Yes.**

Q. When is the first time you saw this document, Dr. Villarreal?

**A. This was in January of 2023 that I first saw this document --**

Q. So you -- I'm sorry, I didn't mean to interrupt you. When?

**A. January 2023.**

Q. Okay. Well, more precisely in January of 2023. This document is dated January the 10th. I'll represent to you that I submitted it to AISD's legal counsel on January the 11th of 2023. Did you see it on or about January the 11th of 2023?

**A. It would have to be around then, yes.**

Q. Okay. When you got this document on or about January the 11th, 2023, what, if anything -- did you discuss this document with Mindy Smith?

**A. Yes.**

Q. What did you discuss -- tell the Court, if you would, what did you discuss with Mindy Smith about this document on or about January the 11th of 2023.

**A. Yeah. I -- so the conversation was somewhat -- I remember saying to her, "Well, this is good. This is**

**the first time that I have seen anything that's specific as to why she needs a dog at work." So I said, "We're getting closer. The only thing we don't have is reasonable alternative accommodations, if that" -- and so that was the extent of the conversation.**

Q. What was the outcome or decision that you and Ms. Smith came to, then, on or about January the 11th of 2023 when you had this discussion about Dr. Vandeven's document that is here on the screen as Strife 109 to 114?

**A. It was my understanding that Mindy was going to reach out to see about getting verification on any alternative accommodations. And once we got that information, we'd be able to go to the committee, the accommodations committee again, to see if we can finalize a decision.**

Q. Dr. Villarreal, were you aware that after I tendered this document and other documents related to this examination to AISD, that AISD still demanded that Ms. Strife undergo a medical examination?

**A. I -- from what I recall, this was received -- we asked for a medical examination right before the winter break, that was scheduled for right when we got back in January. That didn't happen. And then we got this. And so it's my understanding that once we got this,**

**we -- I don't believe, unless it happened without my knowledge, that she was -- that Alisha was asked to still go to the Concentra physician. I was under the understanding since we got this, we were going to use this.**

Q. Is it possible you're mistaken?

**A. As I said, I assumed. I don't know what conversations may have happened between Mindy Smith and Alisha after that.**

MR. NEWAR: Candice, would you pull up AISD 456 to 458.

Q. (BY MR. NEWAR) Dr. Villarreal, I'm showing you now what's marked as Strife 457 -- or rather four fifty -- let's see, 457.

MR. NEWAR: And take it all the way down to the second page, Candice, 458.

Q. (BY MR. NEWAR) Do you see that? It's a letter from Kaye DeWalt, general counsel.

**A. I do.**

Q. It's dated January the 13th of 2023, to me.

**A. Correct.**

Q. Have you ever seen this letter before?

**A. No.**

Q. I want to give you a full chance to read it. Let us know when you've finished reading the first page.

**A. (Examining document.) Okay.**

MR. NEWAR: Go to the second page, Candice, please.

**A. (Examining document.) Okay.**

Q. (BY MR. NEWAR) Have you read it now?

**A. I have.**

Q. You have not seen this letter before today; is that correct?

**A. Correct.**

Q. You saw the last line of that letter, which reads, quote: Toward that end, you are hereby notified that the human resources department will contact Ms. Strife again to offer another appointment for a medical examination [sic]. It is my hope that you will encourage her to participate in the medical evaluation offered by Aldine ISD so that we can expedite the ADA review and determination process. End quote.

Did I read that correctly?

**A. Yes.**

Q. Did you approve of the decision to still require Ms. Strife to undergo a medical examination after receiving the documentation from Dr. Vandeven and Dr. Makulski?

**A. If it would tell us if there's any alternative accommodations, I would say yes, because that's what was**

**missing from -- from the previous documentation.**

Q. All right.

MR. NEWAR: Dr. Villarreal, we're getting close to the end. I want to give you and the court reporter an opportunity to stretch your legs. We're at 4:00 o'clock and so take about five minutes if that will allow you and Robin to have a little break, and then we'll come back and try and finish up. Okay?

THE WITNESS: Very good.

(Recess from 3:58 p.m. to 4:07 p.m.)

Q. (BY MR. NEWAR) I just have a few more questions for you, Dr. Villarreal.

So in the approximately five years -- six years that you were the chief human resources officer for Aldine ISD, how many employees applied -- other than Ms. Strife, applied for a service dog as a reasonable accommodation?

**A. There was one employee who had a service dog prior to me taking on this role. And as any accommodations, you need to I guess reapply or resubmit documentation, whether it's every six months or a year, depending on at the time what the forms were.**

**And so we worked with another employee who just wouldn't submit the documentation. So I can't say that they actually requested it because they didn't submit**

**anything. They were just wanting to continue it. And so we tried to work with the employee, and then the employee ended up resigning. So that's the only other one.**

**I was made aware that we thought there was going to be another employee requesting a service dog right around the time that Alisha was requesting one; but, from my knowledge, that employee never did request one.**

Q. So then the answer to my question would be there is only one other employee who, while you were the chief human resources officer, ever had or requested -- well, let me back up. I want to break that down.

No one, other than Ms. Strife, requested a service dog while you were the chief human resources officer; is that correct?

**A. Correct.**

Q. But someone -- another employee had a service dog while you were the chief human resources officer, and then that service dog was not approved for continuous -- a continuation; is that correct?

**A. I wouldn't say wasn't approved, or denied, it's just they didn't -- they didn't complete the process and, you know, for us to make any sort of decision and so -- and then they ended up resigning.**

Q. Dr. Villarreal, are you familiar with the AISD

K-9 program?
**A. Are you talking about from the police department?**
Q. Yes.
**A. I mean, I understand we have our K-9 officers, yes.**
Q. What is the -- what are -- what do the K-9 officers do at AISD?
**A. We just added one, and I should know this, so I feel bad, because I think there's three; but they all do different -- you know, we have one for drug searches, I think one for weapons, I don't know what this newest one -- it slipped my mind. I believe there's three.**
Q. When you refer to a K-9 officer having responsibility for drug searches, are you referencing the fact that the K-9 officer, the police officer, uses a drug sniffing dog to conduct drug searches on campuses?
**A. Correct.**
Q. And does the K-9 officer actually take the drug dog into the schools to conduct the searches?
**A. Yes.**
Q. And do those dogs interact with students in terms of ever sniffing the students themselves?
**A. I'm not sure. Here in Aldine -- so I've never witnessed it myself. From my experience in other**

**districts, typically the way it works in school districts is the drug dogs will come in and they'll sniff lockers; or if they go into a classroom, students are asked to leave or exit the classroom and the dog goes and sniffs around. And if it, like, sniffs the backpack or the belongings, it identifies, then the police officer will work with the student in the search. But actual dog sniffing the students, that's no.**

Q. What about the drug -- I'm sorry -- the K-9 officer who's tasked with using a dog to find weapons in the school, what is -- how is the dog used in that context?

**A. It's used in the same manner. Like, it doesn't sniff the -- any actual individual. It would like sniff the surrounding areas, the backpacks, lunch boxes, things like that.**

Q. The dog -- the dog that's conducting -- or helping the officer conduct the weapons search actually enters into classrooms and in the buildings, the school buildings themselves; is that correct?

**A. Again, I'm not sure here in Aldine. I know my previous districts that would -- the answer would be yes. So I don't want to speak out of line for Aldine ISD.**

Q. Have you yourself ever encountered the drug dogs

in meetings -- or the K-9 dogs, I shouldn't just say drug dogs since there's also a weapons dog -- but have you encountered these dogs in meetings of the school board?

**A. Not at the school board, no.**

Q. Are you aware that AISD has actually honored one of the K-9 officers and one of the dogs in a school board meeting?

**A. Yes.**

Q. What do you recall about that specifically?

**A. I'm trying to think which month it was. I was off to the side. I believe "Delta" was the dog, because I've been around the dog many times, and as I testified earlier, I am a dog -- I do have dogs and love dogs.**

**So that officer was honored, if you will. We do once -- at every board meeting we honor employees for job well done. I can't recall what they did. I just remember I was -- that was a meeting I was busy off to the side, so I don't even remember -- I know they were there, but I didn't encounter Delta, the dog, at the time. But I do know I saw it all up on the screen, because they put their pictures up there, that they were being honored.**

MR. NEWAR: All right. I believe that we've concluded your deposition, and I appreciate your time.

So we will pass the witness.

MR. RUSH: AISD will reserve for trial.

MR. NEWAR: Okay. Thank you, guys. I hope you have a nice weekend.

(Concluded at 4:15 p.m.)

CORRECTION PAGE

WITNESS NAME: DR. JAVIER VILLARREAL DATE: 01/12/2024

PAGE LINE CHANGE REASON

SIGNATURE PAGE

I, DR. JAVIER VILLARREAL, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted on the correction page.

______________________________
DR. JAVIER VILLARREAL

THE STATE OF TEXAS )
COUNTY OF ______________ )

Before me _____________________ on this day personally appeared ______________________ known to me [or proved to me on the oath of ___________________ or through ______________________ (description of identity card or other document)] to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this ______ day of ________________, 2024.

____________________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF T E X AS

My Commission Expires:

_________________________

THE STATE OF TEXAS )
COUNTY OF HARRIS )

REPORTER'S CERTIFICATION
REMOTE ORAL DEPOSITION OF DR. JAVIER VILLARREAL
TAKEN JANUARY 12, 2024

I, ROBIN GROSS, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, DR. JAVIER VILLARREAL, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on ________________ to the witness or the attorney for the witness for examination, signature and return to Nell McCallum & Associates, by ______________________;

That the amount of time used by each party at the deposition is as follows:

MR. SCOTT NEWAR - 2:36

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 20th day of January, 2024.

ROBIN GROSS CSR, TEXAS CSR NO. 9015
Expiration Date: 07-31-25
Nell McCallum & Associates, Inc.
Firm Registration No. 10095
Expiration Date: 01-31-2025
718 Westcott
Houston, Texas 77007
(713) 861-0203/Fax(713) 861-2324